[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action brought by the plaintiff, Diversified Group Brokerage Corporation ("Diversified"), against the defendant, Damman Insurance Associates ("Damman"), alleging tortious interference with a business relationship and violation of the Connecticut Unfair Trade Practices Act ("CUTPA").
I. Diversified's Business Relationship with the Portland Board ofEducation.
Commencing on September 1, 1987, Diversified entered into a contractual relationship to serve as a Third Party Administrator for the Portland Board of Education's (BOE) various insurance plans. Specifically, Diversified acted as the administrator for the partially self-funded group health, dental prescription, drug and/or life insurance plans for the eligible employees of the BOB. The services provided by Diversified included reviewing, determining eligibility and processing insurance claims of eligible BOB employees. The last full term annual Administrative Services Agreement that was entered into between Diversified and the BOE was for the period September 1, 1993 through August 31, 1994.
II. Consolidation of BOE and Town Insurance Plans.
The town employees of Portland historically had a separate insurance plan from the BOE employees. In late 1993, Donald W. Goodrich (Goodrich), Finance Director of the Town of Portland (the town), decided to attempt to consolidate the separate insurance plans and programs under one carrier/administrator with a view toward reducing costs and improving services and controls. In part, Goodrich wanted to make this change because projections for the BOE budget for 1993-1994 indicated that it would be in a deficit position as a result of health insurance costs and other expenses. Goodrich's decision to attempt to consolidate all the insurance programs was made before the defendant, Damman, had even been contacted regarding this matter.
In early 1994, Goodrich held meetings with the School Superintendent, the Board of Education Chairman and the First Selectman to discuss a new health insurance program. Ultimately, they decided to merge all Town CT Page 8551 plans into one consolidated plan. In February of 1994, Goodrich decided he needed an insurance advisor for assistance in putting together a unified health benefit program. Goodrich contacted Damman which was already an agent for the Town employees with respect to dental and some medical insurance. Goodrich first met with representatives of Damman on March 15, 1994 and requested that Frank Zurlo ("Zurlo") of Damman act as an advisor to the Town to help create a Request For Proposal (REP) for a unified health insurance program. Damman took on the position of advisor with the understanding that if a new combined medical insurance plan was implemented, Damman would be named agent of record for the Town of Portland and the BOE and would earn commissions on the premiums paid.
The type of plan sought by the Town was a unified plan with a single third party administrator who would pay claims. administer the plan and provide a comprehensive network of providers.
Damman prepared an REP for the new program based on information supplied in large part by Goodrich. When Damman put together the requirements for the REP it was not aware of any issues regarding Diversified's performance in administering the BOE's health insurance program.
Damman was one of the companies permitted to bid on the new plan for the consolidated coverage. Nine companies received REP's and six of them, including Diversified, responded to the request. On June 1, 1994, three companies that responded to the REP were permitted to make presentations to the collective bargaining representatives of the town. Goodrich made the final decision as to who the three finalists would be. Diversified was not selected as one of the three finalists because it did not have its own internal network of providers and its plan was more expensive than that of the other bidders.
Of the three finalists, Damman recommended that the town choose Connecticare for the consolidated insurance plan. The town ultimately selected Connecticare in July of 1994. The decision to not renew the Plaintiff's contract as the third party administrator was made on July 26, 1994 when the town accepted the bid of Health Benefit Administrators (an affiliate of Connecticare) to administer the new consolidated medical plan. Damman was appointed Agent of Record for the town effective September 1, 1994. Because the changeover to a new plan could not be made quickly enough to prevent a gap in coverage, it was necessary for the BOE to enter into a new agreement with Diversified obligating Diversified to continue to administer group health insurance for the BOE teachers and group life insurance for all BOE employees. This agreement was cancelled by the BOE effective January 1, 1995.[1] Diversified, however, continued to have ongoing obligations to provide administration services CT Page 8552 to BOE through October of 1995. Specifically, Diversified continued to fulfill its obligations including processing incoming claims under the expired plan. As contemplated under the agreement, Diversified also issued IRS forms in January or February 1996 for calendar year 1995.
Accordingly, as a result of the consolidation of the insurance plans and the choice of a new third party administrator for the town, Diversified's contractual business relationship with the BOE was terminated as of January 1, 1995 except for its remaining obligations under the expired Administrative Services Agreement. Diversified was allowed to complete all of these duties under its expired contract without interference by Damman.
III. Investigation of Diversified.
After the decision was made by the town in July of 1994 to terminate its annual agreement with Diversified and to choose a Connecticare affiliate to be its new third party administrator, the BOE requested that Damman do a review of Diversified's processing of claims. During meetings with employees and teachers in August and September of 1994 to explain the new plan, some issues were raised regarding Diversified's prior handling of claims. Accordingly, the decision to review Diversified's performance was made by the Town, not Damman. Additionally, this decision was made by the town after it had decided to terminate its relationship with Diversified and after Diversified's replacement had been selected.
Damman advised the Town officials to have an independent party do an audit of claims processing by Diversified. The town then chose Health Solutions as the firm to do an independent audit. In June of 1995, Health Solutions provided to counsel for the town an analysis of medical claims administered by Diversified in which it concluded that approximately sixteen percent of the reviewed claims were not processed properly.
During the course of the investigation, questions were also raised regarding whether the commissions charged by Diversified were too high and whether the midyear change in an excess loss carrier had been proper.
In June of 1995, a full year after the town had decided to terminate its ongoing contractual relationship with Diversified, Damman wrote a memorandum entitled "Items of Concern" which discussed (1) the conclusions reached by Health Solutions regarding Diversified's processing of claims, (2) the commissions received by Diversified, (3) the replacement of discount schedules and (4) an issue regarding whether the town had received full reimbursement for two employees. This document was prepared at the request of an attorney for the BOE relative to a possible CT Page 8553 suit by the BOE and the town against Diversified. This document was also written and transmitted long after the decision was made by the town to terminate its ongoing contractual relationship with Diversified. In any event, based on the evidence presented there was insufficient evidence presented for the court to find that any of the items of concern listed were made in bad faith.
Based on input from legal counsel, the town and the BOE ultimately decided to pursue a claim against Diversified in the summer of 1995. This was a full year after the decision had been made by the town to terminate its contractual relationship with Diversified. The thrust of the action against Diversified included allegations that it had receive excessive and/or undisclosed commissions and that it had engaged in erroneous claims processing. The arbitration was ultimately settled when Diversified payed the town approximately $160,000.
 DISCUSSION OF LAW
Tortious Interference Claim
Diversified's tortious interference claim alleges that Damman made false representations to the town and BOE which resulted in the BOE not renewing the Administrative Services Agreement. Diversified also alleges that it had to expend funds to defend against the false representations and that its business reputation suffered.[2]
The elements of an action for tortious interference with contractual or beneficial relations are (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the intent to interfere with it; and (4) the consequent actual loss suffered by the plaintiff. Solomon v. Aberman, 196 Conn. 359, 383 (1985). This means that the plaintiff must do more than show that the defendant's actions caused a loss of the plaintiffs business. "A cause of action for tortious interference with a business expectancy requires proof that the Defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the Defendant acted maliciously. Sportsmen'sBoating Corp. v. Hensley, 192 Conn. 747, 754 (1984) (Internal quotation marks omitted.), citing Jones v. O'Connell, 189 Conn. 648 (1983). For the plaintiff to prevail it must prove the defendant's conduct was in fact tortious. Robert S. Weiss and Associates, Inc. v. Wiederlight,208 Conn. 525, 536 (1988).
Diversified has failed to establish that Damman engaged in any activities which would constitute tortious interference with a contractual or other business relationship.[3] Instead Goodrich, on behalf of the town, made an initial decision, without input from Damman, CT Page 8554 to consolidate the BOE and town insurance plans. Subsequently, the town, not Damman, chose a new Third Party Administrator for its consolidated insurance plans based on legitimate criteria. All of these decisions were made long before any concerns were raised by Damman regarding Diversified's performance. There was also insufficient evidence presented to establish that the issues raised by Damman regarding Diversified constituted misrepresentations.
Finally, any harm which Diversified claims it suffered in defense of its reputation resulted from activities of the Town and the BOE, including the town bringing an action and submitting the matter to Arbitration. Damman's assistance, at the request of the Town and BOE, in reviewing information ultimately used in the law suit brought by the Town and BOE against the Plaintiff does not constitute tortious conduct.
 CUTPA
The court finds that Damman did not violate the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b (a) et seq. "[I]t is well settled that in determining whether a practice violates CUTPA [the Connecticut Supreme Court has] adopted the criteria set out in the "cigarette rule" by the federal trade commission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise . . . in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) Willow Springs CondominiumAssn., Inc. v. Seventh BRT Development Corp., 245 Conn. 1, 43 (1998). Additionally, a violation may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. Conaway v. Prestia, 191 Conn. 484 (1983).
Based on the above findings, the court finds that none of the criteria has been met for a CUTPA violation.
Judgment is hereby entered in favor of the Defendant.
 CHASE T. ROGERS SUPERIOR COURT JUDGE